The second day of our panel sitting here in Atlanta, Judge Newsom and I are very happy to have with us Judge Steven Grimberg, who sits here only a couple of blocks away in the District Court for the Northern District of Georgia. We often get help from our District Court colleagues, and there are times when I don't think we could do our job if we didn't have that help. So we're very appreciative and very thankful that he is here with us. We have two cases this morning, and we'll start in a minute. You know the lighting system that governs your time. When the yellow light goes on, that means that your time is drawing to a close, so begin to wrap up. If we take you beyond the light, then don't worry about that. You're on our time and not yours. And with that, we'll begin with our first case, which is number 20-10150, Ricky Johnson v. Dr. Sharon Lewis, et al. Now let me just say that with regard to the demonstrative exhibits, we have no problem or issue with the demonstrative of the timeline. The case law, we thought we could do without. And so if you want to file your timeline after the argument with a Rule 28 letter, you can, and the other side is also allowed to do the same with the timeline if they want. So if you would like to do that, you've got until next Wednesday to submit a timeline, a chronology of your version of events, and we'll be happy to accept those. Okay. Mr. LaGreene, whenever you're ready. Did I spell your or pronounce your last name correctly? Yes, Your Honor. Mr. LaGreene. Okay. Good morning, and may it please the Court. Jordan LaGreene, appearing for Mr. Johnson. This case is about the five and a half years that defendants denied Ricky Johnson prescribed treatment for his worsening hepatitis C. Years during which his disease progressed, from stage four with cirrhosis. These years of neglect were not mere negligence. Johnson's primary physicians during this period knew that he had hepatitis, knew that he needed treatment, yet failed to provide it. Can I ask you a question, and maybe this gets to Judge Jordan's timeline suggestion, but we can't really just like lump all the providers in together, right? Because the disease was manifesting itself and sort of representing itself in different ways at different times, right? That's correct, Judge Newsom. So I guess I want to be careful about just saying like sort of a time during which the providers were doing X, right? Because different providers were doing and not doing different things at different times. Would you sort of like maybe break down your analysis, perhaps provider by provider, if that makes sense to you? Absolutely, Judge Newsom. Unless the Court objects, I'll start with Dr. Farrell. Dr. Farrell, for 16 months that Johnson was under the care of Dr. Farrell, Johnson had a live prescription, and Dr. Farrell failed to treat him. This prescription distinguishes Hoffer and puts this case in the land of Harris, Ankada, and Steele, which showed that a prescription put an onus on Dr. Farrell to provide a credible explanation. I have several subpoints under this. First, Dr. Farrell knew that Dr. Shadhari had prescribed treatment, and unlike the Hoffer plaintiffs, who claimed a right to treatment merely because of the HCV diagnosis itself. Here, Johnson's right to treatment, or at least a presumptive right to treatment, arose because of his prescription. And your contention on that singular point is that there's at least enough evidence in the record to create an issue of fact about whether or not the prescription was valid and complete. Absolutely, Judge Jordan. There are several points I'd like to direct the Court to. The first is that Dr. Farrell expressly disclaims any reliance on his own medical judgment. He says in his declaration that he does not have the expertise to determine when a patient needs to be treated. So his argument that he makes in the, that's made before the District Court and made in the briefs, that he doubted the efficacy of that treatment, that's nowhere reflected in the record, and he really disclaims any ability to make that kind of good faith dispute with another doctor's judgment in his own declaration. The second point I would highlight for the Court is it's true that Dr. Choudhury, in his declaration, says that one of the reasons that he prescribed treatment was Johnson's litigiousness. However, he also mentions other reasons, for instance, an abundance of caution. Now, Johnson has the right to be able to, for instance, examine Dr. Choudhury at trial and determine the weight that Dr. Choudhury actually placed on what he called caution rather than Johnson's perceived litigiousness. And finally, it's well established that it's a defendant's subjective mental state that matters. So it doesn't matter what Dr. Choudhury says his motivation was in a made-for-litigation statement, that is, his declaration. What matters is whether Dr. Farrell at the time had any reason to believe that the prescription was made for something other than, like, a good faith medical need. And there's just nothing in the record indicating that. One more point on medical judgment. This Court does not need to deter—this is not one of the most difficult cases where you're faced with conflicting judgments from two different doctors. Steele would be a good example of this. And the Court has to determine whether a doctor made a good faith effort to exercise medical judgment. With regard to Dr. Farrell, even assuming that there was a lapse in his judgment, how do we get past qualified immunity? Well, I think there are several ways we get past qualified immunity. First, it's well established, more generally, that there was a right to timely care. And this Court kind of repeatedly, in cases like Melton v. Abstin, which analyzed qualified immunity for four or five different defendants, repeatedly points out that essentially the deliberate indifference burden is so high already that it's highly unlikely that—it's highly unlikely that a defendant will be able to satisfy the summary judgment standard but fail on qualified immunity. Can I ask you a question about Hofer? I take your point that Hofer is not dispositive here because, you know, the policy here provides for sort of—I'll call it like prescription opt-out or whatever. But surely Hofer has some bearing on the degree of culpability, like whether or not this reaches the recklessness standard, don't you think? I think to a limited extent, Your Honor, in the same way that virtually any deliberate indifference case that this Court has kind of has bearing on this. You know— Except Hofer's pretty close, right? I mean, it's not just like any old deliberate indifference case. It is like a liver treatment case. Well, what I think is noteworthy about Hofer is in the very first paragraph of Hofer, this Court made clear that the Florida policy it upheld created an exception that even Stage 1 inmates receive treatment if there was an exacerbating condition or signs of rapid progression. And there's at least a triable issue of fact in the record here that Johnson's disease was progressing rapidly. Even when the initial prescription was written, he had grade 2 hepatitis. Remember, the grade is what's kind of measuring the rate of progression, whereas the stage just measures how far along the disease has progressed. So at the very least, there's a triable issue of fact that there was a really good reason to provide Johnson treatment. Another point I'd like to make about Hofer, and this kind of is transitioning to Dr. Marler for a second, is Hofer never said that once an inmate tests Stage 1, that's it. The state's responsibility or the prison's responsibility is over. No, there has to be Stage 2, Stage 3, or in this case, Stage 4 hepatitis. And Dr. Marler, our first theory for how he's deliberately indifferent is again, you have not a prescription, but a strong recommendation from another physician, a specialist for a repeat biopsy in one year. But three years passed. That's a two-year delay before that repeat biopsy was conducted. And again, although Dr. Marler does not... for the two-year delay. Not the full three. Because he didn't get to Dr. Marler's care until we were partly into the chronology, right? That's correct, Judge Jordan. And in fact, in fairness, the first year wasn't even a delay because the recommendation was for a repeat biopsy after one year. But he is responsible for the full length of the two years after that kind of biopsy was due. And he offers nothing in the record, no indication he's exercising some medical judgment. I think the risk with this case, if the Court decides in favor of Dr. Marler, is that it might inadvertently kind of establish the standard where if an appellate attorney is able to, after the fact, make an argument for medical judgment without any support in the record, then medical judgment just becomes kind of magic words that eviscerate liability. That certainly can't be the case. But beyond that two-year delay, the even stronger argument for Dr. Marler's liability is the 30-day period when he did absolutely nothing after he knew Johnson had developed stage 4. To kind of set the miniature timeline here, Dr. Marler delivered his stage 4 diagnosis on the very same day he told Johnson that he would not receive treatment. One of the big issues we have with the timeline that Dr. Marler submitted two days ago is Dr. Marler kind of fails his obligation that this Court has repeated over and over, most recently in Patel v. Lanier County, that not just the Court, but litigants have to kind of, if they prevail on summary judgment, they have to present the facts in the light or present the defendant's version of the facts. In Patel, the Court said in footnote 1, it's fine for a litigant to highlight a factual disagreement, but they have to defend the judgment below under the defendant's version of facts. Johnson has a very different account than Dr. Marler. Dr. Marler says he assured Johnson he'd receive treatment. Johnson said Dr. Marler told him he would never receive treatment. That's a credibility determination, and that itself should send the case to a jury. But more importantly, you said the defendant's version of facts. You mean the opponent's version of facts. Correct. Could be the defendant, could be the plaintiff. That's correct. The non-moving party, Judge Jordan. Can I ask you a quick question about another Marler-related question? Just a record question, and I'm just asking you to sort of confirm my recollection. The two liver enzyme tests, the AST and the ALT, do I have it right that it's in the Marler piece of this case when both enzyme markers are out of range every time? In the Farrell piece of the timeline, I think you might have one or the other that's out of range slightly, but in the Marler piece of the timeline, they're both out of range more significantly. Is that right? That's correct, Your Honor. I think at the very beginning, when the prescription was written by Dr. Shadhari, he was testing on kind of the high level of normal, and by the time he was seen by Dr. Marler, the enzyme levels, I think specifically it was the ALT, was roughly twice normal. Normal is like 9 to 46, and he was testing around 80. I believe that's something very close to that. I have another record-related question about Dr. Marler. Sharon Lewis contacted Dr. Marler in April of 17 to alert him to the new policy. Is there anything in the record to explain what prompted that call? There's not, Your Honor. We could certainly speculate, but I don't think, you know, I think a jury could infer that there were concerns with the care Dr. Marler was providing inmates. As support for that, we could look at statements from Dr. Marler's co-defendant, Dr. Lewis, and Dr. Ivins, the chief medical director of CoreCivic, who at one point apologized to Dr. Lewis for Dr. Marler's words and actions and for the Dr. Marler situation. So I think that that's one inference that could be drawn, but there's no direct evidence to that, Your Honor. In the amount of time you have, and we'll let you go over a little bit, can you talk about Lewis? Of course. There are three main things I would like to point out with Dr. Lewis. One, Dr. Lewis's name is at the bottom of the appeal denial. It's the only name at the bottom of that denial. Her explanation for this fact, and it's true that she offers an explanation in her declaration, but her explanation turns entirely on her own credibility. United States v. Gaines is on all fours here. That was the tax case. It was a criminal case where the defendant said that he had no knowledge of what was in his tax returns, despite his signature, because he was an illiterate. And the Eleventh Circuit said, well, that explanation offers much in the way of explanation. It's also self-serving. So a jury would be entitled to disbelieve it. So what's not the case here is what the State tries to portray this as is that Dr. Lewis's explanation somehow completely eliminates the record evidence offered by Johnson. But that's not the case. You have a document with a clear inference you can draw from the document and an explanation for that document. Assuming that you have enough evidence to get past the knowledge element, what do you believe that Dr. Lewis should have done? Well, once you get past the knowledge element, kind of an assumption that has to be made is that she, that the grievance appeal process was authentic, that it wasn't a sham proceeding. And as we point out in our blue brief, there was really like overwhelming record evidence that the reason that the appeal was denied was completely false. The appeal was denied because the claim was Johnson had never requested treatment. Yet in Johnson's medical records, which I think we can assume there's good reason to believe Dr. Lewis had access to those, it's very clear. Dr. Shadhari said, or Dr. Ruiz rather, said patient wants to be treated for HCV. That was in all capital letters. So the fact that Dr. Lewis kind of was aware of that and rubber-stamped a treatment denial on something that, on obviously false ground, I think that right there, that alone is probably enough. One final point I'd like to make, though, on Dr. Lewis's deliberate indifference is I just, that's an issue best reserved for the district court because the district court based its judgment solely on Dr. Lewis's knowledge. All right. Thank you very much. You saved your time for rebuttal. Please give Ms. Cusimano and Ms. Lewis a minute extra each, please. I think it's six and nine, so seven and ten, please. Thank you, Judge Jordan, and may it please the court. I'm Ellen Cusimano on behalf of Dr. Lewis and Dr. Farrell. As we've already noted, I'm going to be speaking for now roughly seven minutes, and my colleague will have the remaining time. For the sake of time, I'm going to focus my argument on the claim against Dr. Farrell. When Dr. Farrell first saw Mr. Johnson, Mr. Johnson was waiting to begin a triple drug regimen. But it's important to understand that the triple drug regimen can't just be started at any given moment. And that's because it requires injections and multiple oral medications every day for six to 12 months. If one dosage is missed, the entire treatment could fail. So in other words, this is a very intense treatment, and the decision of when to begin it had to be given careful consideration. Let's talk about a couple of, there are a couple of I think overall or overarching reasons for not giving him the treatment, right? And you can correct me if you think I'm wrong. The first one was that he was absent. He had to go to another facility for a matter that he had there, and he didn't return for months. That's correct. That's one, right? Yes. So let's put that one off to the side for a second. The second one was that he had hernia repair surgery, right? That's correct. But the record on that second point pretty much shows that he recovered from that pretty, pretty quickly, and he was just given Tylenol to sort of get over the pain of the surgery. So let's work in reverse order. How does that factor into Dr. Farrell's situation? Why couldn't he have been started on the triple drug regimen soon after the hernia repair surgery? Sure. Well, he may have just been given Tylenol, but Mr. Johnson did say in his deposition that his recovery from the surgery was rough and tough. And I would also, I would point out that with a triple drug regimen, there are other side effects that are similar to those that you experience during chemotherapy. That isn't something that you want to subject anyone to when they're trying to recover from major surgery. It's also important to understand that at this time, Mr. Johnson was at stage one, which indicates a very mild disease. So mild, in fact, that usually under treatment. Right. But that only plays in if Dr. Farrell had said, I disagree with what Dr. Chaudhary has prescribed or provided. I think the better thing to do is X instead of Y. And then you've got a disagreement between two medical professionals as to what the better course of treatment is. But there's nothing like that about Dr. Farrell in the record, right? That is correct. There is no evidence that he disagreed with Dr. Chaudhary's medical judgment. The other thing that I would note is that HCV is generally a slowly progressing disease. Sometimes it doesn't progress at all. And if it does, it typically takes multiple years, if not decades. So in other words, time was not of the essence here. This was not a dire situation where Mr. Johnson needed immediate treatment. I would also point out that a few months later, when Dr. Chaudhary saw Mr. Johnson again, Dr. Chaudhary made the decision to forego all treatment at all for at least another year in the hopes that by that time, DAAs would be on the market and the DAAs would be a much better, more convenient option for Mr. Johnson. And so if we look at what Dr. Farrell subjectively knew, he knew that Mr. Johnson was stage one. He knew that the disease was slowly progressing. And he knew that the medical specialist in the case, based on his medical judgment, did not think it was the right time to begin treatment and that it was okay to wait another year for the DAAs to come onto the market. And in the interim, what Dr. Farrell did is he made sure Mr. Johnson was enrolled in a clinic. He made sure Mr. Johnson saw an HCV specialist and he monitored Mr. Johnson. And I think this Court made clear in Hoffer that this type of monitoring of stage one inmates, that is treatment. And it's treatment that comports with the Eighth Amendment. Well, I mean, I think Hoffer is instructive because as Judge Newsom said, it's a very general same issue that we have here. But Hoffer didn't involve, Hoffer involved a challenge to a general policy. Correct. And here, what makes this case different, not in terms of result, but at least in terms of analysis, is that you have an inmate with a prescription. True, but the doctor who gave that prescription is the same doctor who decided that it was not the right time to move forward with the prescription. Yeah, but that was later, right? Correct. And so essentially what we have here is it's not the right time to give the prescription. And so all we have here is monitoring. Your Honor, my time is running a little bit low, so I would say, you know, none of this rises to the level of criminal recklessness that is required for deliberate indifference. Even if it somehow did, Mr. Johnson still has to overcome qualified immunity, which he hasn't done here. I think the case from this Court that has facts most similar to the facts here is, again, Hoffer. And there's nothing, even though Hoffer may have some differences, there's nothing in Hoffer that would have given Dr. Farrell notice that what he was doing was unconstitutional. Well, I mean, Hoffer is well nigh irrelevant for qualified immunity purposes, right, because it postdates the events in question. Yes, that is a good point. But Mr. Johnson also has not come forward with any cases that would clearly establish the law here. Let me take you beyond your time for one more question, if I could. Yes. One of the arguments that Mr. Johnson makes is that with regards to his absences, his being in the county jail, for example, for a period of months, the second time he went to the county jail, his medications or treatment followed him, and it wasn't a problem. Correct. What's your response? I do have a response to that, and I would say that the situations were vastly different. So when he did receive medication in 2018, first of all, he received DAAs, which require only one pill. It requires only two to three months in duration, has almost no side effects, and he was at stage four at that time. He was in critical condition, and it was imperative that he receive treatment as soon as possible. He was also only at county jail for two weeks. That's much different from what we had in 2013, where he was going to be gone for three months. He was only at stage one, so time was not of the essence, and he would have been taken a triple drug regimen, which was much more intense treatment, much more difficult to coordinate, and much less convenient. So I think the circumstances there were just vastly, vastly different. Okay. Thank you, Your Honor. Thank you very much. Ms. Lewis. Yes. May it please the Court, good morning. I'm Wrighton Lewis on behalf of Dr. Marler, who treated the plaintiff while he was at Jenkins Correctional Facility from 2015 to 2017. And what Johnson argues in this case is that Dr. Marler was deliberately indifferent in two ways. One, he did not order a biopsy between the plaintiff's arrival at Jenkins and June of 2017. And two, that after he received the fibrosure test results in June of 2017, he should have moved faster in prescribing the treatment. But the record overcomes both of those arguments. First, the biopsy question. When the plaintiff arrived at Jenkins Correctional Facility, his condition was stable. Dr. Marler monitored the plaintiff with blood tests and regular physical examinations. He saw him every six months in the chronic care clinic and more often when the plaintiff had specific medical complaints, like elevated blood pressure or skin rash. Would Dr. Marler have become aware of the updated 2016 policy? That's not in the record, Your Honor. What is in the record is that he became aware that the state was using the fibrosure test on April 20th of 2017 and he immediately ordered that test for Johnson. Anything in the record why he was notified in April 2017 of this policy by Sharon Lewis? No, that's not explained in the record. He administered... What explanation did Dr. Marler provide, if any, for not doing the biopsy? So the biopsy was not necessary or suggested by his treatment. He was ordering other blood testing. He was monitoring his condition. A biopsy is... No, no, no. But I want to... My question is, what did he say the reason was for not ordering the biopsy? He did not avert that specifically in his affidavit. Isn't that a problem for you? I don't think so, Your Honor. It's not a problem. You have another doctor who says there should be a biopsy in a period of time, right? He has a disease that is going to progress at some level, right? And whether you think it's one year or two years or somewhere in between, no biopsy is done and he doesn't provide a medical reason for not doing it. Isn't that one of the prescribed annual biopsies? No, it's not a... I didn't say prescribed. There was a suggestion, right? Or a... Am I right that it was a recommendation by Dr. Chaudhary that there be a biopsy within a period of time? No, Your Honor. What the record shows is that Dr. Chaudhary said he was going to see Johnson in one year for consideration of a repeat biopsy. Okay, I thought the record showed differently, but maybe you're right. Maybe you're right about that. It's in Dr. Chaudhary's affidavit. I recommended that Johnson's HCV continue to be monitored and that he return to see me the following year in 2015 for consideration of a repeat biopsy. And Dr. Marler doesn't comment on that? He doesn't. Not in his affidavit, Your Honor. But at best, that's a difference of opinion on the appropriate diagnostic test to administer. It is if he says it is. You're saying... I'm sorry. I misunderstood your question. No, no. If Dr. Marler explains in his affidavit or contemporaneously in his medical notes, I'm not doing... I've seen the note from Dr. Chaudhary. I'm not going to go down this road for these reasons. I'm monitoring him. He's stable, etc., etc. That's one thing. But normally when you talk about one doctor following a certain course, it's because he or she, in medical opinion, has decided that's the best option. We don't have that here. The deliberate indifference analysis, though, is both subjective and objective. So his objective decision not to order a biopsy, which the record suggests he did not order a biopsy, is on the objective scale, right? And it's a difference of opinion in the appropriate diagnostic test. The subjective element of deliberate indifference here is that Dr. Marler had no subjective basis to order a biopsy and no subjective knowledge that any other doctor had considered a biopsy. The record shows that the plaintiff told Dr. Marler that he had had a biopsy. And Dr. Marler requested those records from the state. And prior to the FibroTest, the records are that Dr. Marler never saw any of those other records. Well, but objectively, though, in June of 2017, Dr. Marler received the results from the FibroTest. Yes. And does what? He immediately takes action. He sees the results on June 12, 2017, and he tells the plaintiff he qualifies for the testing. That same week, he talks to his regional medical director about the results of the test and about the treatment. And then he orders additional testing, which is required by the 2016 policy. A month later. A month later after the results. The email correspondent says he had already talked to his regional director and they were going to do additional testing. The test wasn't administered until August 2nd, but Dr. Marler didn't have the ability to administer the test. The plaintiff had to be taken off-site for that test to be administered. So there's no exact date that he ordered the test, but we know that the week after he receives the FibroTest, he's entering it into the condensed medical record that there's going to be additional testing. He's speaking to his regional medical director about additional testing and that that test is done by August 2nd. And this is in spite of Dr. Marler's view that the FibroTest was not a reliable indicator, standing alone, of cirrhosis of the liver. He aversions his affidavit that it was his judgment that it was not. I mean, he had the FibroTest on one hand that indicates cirrhosis, but he's got the APRI score, which does not, and he's got the plaintiff's subjective report of his symptoms, and he's got the other blood work that he's done. And in his view, the FibroTest standing alone was not a reliable indicator. But nonetheless, he goes ahead and he completes the pre-treatment therapy checklist before he's even received the additional testing, which confirmed his medical judgment that the plaintiff did not have cirrhosis. Can I ask you a quick question? Am I right in the question that I asked Mr. Green that it's on Marler's watch that the liver enzymes, both of them, are out of range each time? So what... Out of range, I don't know, Judge Newsom, but what I do know is what's in Marler's affidavit. And what Dr. Marler says is that his lab test showed mild elevation compatible with his history of chronic hepatitis infection. And he talks again about his later scores. In June of 2016, his APRI score, which is a ratio, you take the other test and you create a ratio, his score was .671, which did not indicate a level of liver involvement then requiring treatment, which would be a score greater than 2.0. He also had no clinical signs or symptoms typical of liver damage or cirrhosis that would prompt further workup at that time. And his APRI test that he had the same, the APRI score that he had the same day he had the fibrosur test still was not at a level of 2.0 or above, which would have indicated cirrhosis. Of what relevance is it or should it be to us that Lewis and Ivins respond the way they do to the lack of treatment following the stage four suggestion, diagnosis, whatever you want to call it? Those emails don't set forth a medical judgment or any sort of medical opinion. They say that the treatment should be administered. But Dr. Marler had recommended the treatment. Dr. Marler did what he had the authority to do, which is order additional testing and complete the pre-therapy checklist. He did not have the authority to procure the medication or administer it unless it was approved. And Dr. Marler did everything that was in his authority to do based on both the policy and everything that's in the record. Remind me then, and I'm sorry if I just don't remember the record as well as I should, but if you're saying that Marler, it was sort of out of his hands. He had sort of discharged his obligation and now it's just like bureaucratic incompetence or whatever, why the treatment doesn't begin forthwith. I mean, is that the suggestion? Do we even know what accounts for the delay? Following his, I mean, I don't suppose you're suggesting that it was like an enthusiastic recommendation. This guy needs treatment ASAP. But following whatever it is that he said, what then accounts for the delay? The record doesn't speak to what accounts for the delay, Judge Newsom. But the deliberate indifference analysis has to look at whether Dr. Marler was deliberately indifferent. The 2016 policy says the FibroTest indicates a referral. And the record is clear that Dr. Marler spoke to his regional director and recommended the treatment. Does he explain the delay? As short as that delay is in his view, does he explain the delay? The delay is the weight on additional, according to the emails, the delay is the weight on the additional testing. Mr. Ricky Johnson's treatment evaluation is nearly completed with only an abdominal ultrasound remaining, and that has been scheduled. He signed the pre-therapy checklist in July. The ultrasound results on August 2nd. Then he orders a follow-up CT scan. And approximately six weeks later, the plaintiff is transferred to another facility, and Dr. Marler is no longer treating him. Okay. Thank you very much. Thank you. One point on Dr. Farrell and three points on Dr. Marler. First, with respect to Dr. Farrell, let's go back and look at what Farmer v. Brennan says. A doctor is deliberately indifferent when he knows of, and yet disregards, an excessive risk to inmate health and safety. Think about how that applies to Dr. Chaudhari, on the one hand, who's not a defendant right now, and Dr. Farrell. Dr. Chaudhari withdrew the prescription, not because he didn't think it was necessary, but because he thought a better prescription would be on the market within a year, and that it was worth the risk. That is a clear exercise of medical judgment, which is why he's not being represented in the courtroom today. Dr. Farrell, on the other hand, can't arrest a medical judgment. Opposing counsel admitted that, and yet also argued several times that Dr. Farrell just didn't think it was important. Well, he was stage one. That's incompatible. You can't, on the one hand, disclaim reliance on medical judgment, and on the other hand, look at a prescription from a specialist, a specialist who, in your own declaration, you say is responsible for treatment decisions, and just decide, eh, it's not too serious. Stage one. Those two explanations are incompatible. But Dr. Farrell's treatment was consistent with the policy at the time. It does, and the policy is clear that the ultimate treatment decisions are made by the HCV specialist. That's Dr. Choudhury. Dr. Lewis says that. The policy itself says that. With respect to Dr. Marler, I want to point on the biopsy question and whether it was a recommendation. Let's look at how Dr. Marler characterizes it. The state paper chart documents that Dr. Choudhury recommended biopsies every year. That's a direct quote from Dr. Marler's own medical notes. You can find that at ECF 157.1 at 7. Dr. Marler himself thought it was a recommendation. So this suggestion from opposing counsel that, well, it was just more of like a something less than a recommendation, not even Dr. Marler thought that. Two, Dr. Marler actually reviewed Johnson's medical notes in July 2015. In July 2015, he noted state medical records received, reviewed. So he was aware of this years before, years before his counsel suggests. Second point, the idea that the fiber sure isn't a reliable indicator. I think in Sylvie Shaw, what you see this court doing is having two separate levels of analysis. Yes, it's true that the court defers to is this actually medical judgment? And to Judge Newsom's point, what's the influence or what's the effect of Dr. Lewis's and Dr. Ivan's statements? I think that's powerful circumstantial evidence, which Farmer says is admissible here, powerful circumstantial evidence that Dr. Marler knew exactly what he was doing. Again, the fact that Dr. Marler, on the very same day that Johnson received the HCV stage four diagnosis, told Johnson, you're not going to get treatment, combined with the fact that he never received treatment, combined with the fact that the record at least creates a triable issue of fact as to whether Dr. Marler ever submitted Johnson's case. Those facts right there merit this case going to a jury. I'm sorry, can I ask you one more? I think the most important thing that Ms. Lewis said that I'd just like to get your response to is her suggestion that Marler, I mean, I'll confess, I think that Marler is the tougher piece of this case for that side of the courtroom. I think, you know, you've got the liver enzymes elevated every time, you've got the fibrosure test, you've got the Lewis and Ivan's emails. To me, that's it's bad atmosphere. She says, though, that it's sort of essentially like in response to these bad indications, he did everything he could. He sort of requested the treatment, and then before he could see it through, Johnson was gone. So what's your response to that? Okay, three responses, Your Honor, and I'll try to be brief on these because I know I'm over time. The first response is Dr. Marler never says in his own declaration what he submitted the case for treatment. There's no indication in the record that the case was submitted to treatment. We'll be addressing this more in our 28-J letter. But at the very least, what the court can't do is grant a favorable inference to Dr. Marler as to when treatment was submitted. So since he didn't provide a date, the only thing the court can assume is that it came on the last possible day he was responsible for Johnson being treated. That's number one. Second point, the ultrasound test. That's actually worse for Dr. Marler. Dr. Marler didn't say, as opposing counsel suggested in their recent exhibit, that the ultrasound confirmed no cirrhosis. He said the degree of cirrhosis is still unclear. The degree of cirrhosis. Cirrhosis by definition is stage four. So what Dr. Marler, by his own admission, is saying is not that the ultrasound ruled out cirrhosis, but that it's unclear. Going back to Farmer, an excessive risk to inmate health and safety. This suggestion that the fibrosur was only 61% accurate, I would like Dr. Marler to have to say to a jury that he only thought there was a 61% chance that Johnson had advanced cirrhosis and that's why he didn't move quickly. And finally, the CT scan. We argue in our blue brief the CT scan had nothing to do with Johnson's hepatitis treatment. That was a test for liver cancer. Defendants dropped that argument in their red brief and are now trying to resurrect it days before oral argument. We shouldn't allow them to do that. Thank you very much. Thank you. Mr. Green, we know you were appointed to represent Mr. Johnson. We appreciate your acceptance and the firm's acceptance of the case and your service for him. We do appreciate it. Thank you. My pleasure. All right. Thank you all very much. Thank you. Maybe, I guess. That's probably what it was. Hey, don't be shy. Come on up. I'll go ahead and call the second case.